**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY E. ALLEN, SR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 11 C 3159** |
| **v.** | ) | |
| | ) | **Magistrate Judge Morton Denlow** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Gregory E. Allen, Sr. ("Plaintiff" or "Claimant") brings this action under 42 U.S.C. 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and finding Claimant not disabled through December 31, 2001, the date last insured. Claimant raises the following issues: (1) whether the ALJ erred in finding that Claimant does not meet or equal Listing 12.06; (2) whether the ALJ's determination that Claimant can perform full-time work was supported by substantial evidence; and (3) whether the ALJ properly evaluated Claimant's credibility under SSR 96-7p. For the following reasons, the Court grants Claimant's motion to reverse or remand the decision of the Commissioner, denies the Commissioner's motion to affirm the Commissioner's decision, and remands the case to the Commissioner for further proceedings consistent with this opinion.

# I. BACKGROUND FACTS

## A.    Procedural History

Claimant first filed an application for DIB on October 4, 2001.  R. 114-16.  The Social Security Administrator ("SSA") denied his application on November 27, 2001 and no appeal is documented.  R. 96.

Claimant filed a second application on November 4, 2004, claiming a disability onset date of June 20, 1996.  R. 132-34.  The SSA denied Claimant's second application and denied his request for reconsideration on June 29, 2005.  R. 101-04.  Shortly thereafter, Claimant filed a timely request for a hearing before an ALJ.  R. 105.  On September 14, 2006, Administrative Law Judge ("ALJ") Paul R. Armstrong presided over a hearing at which Claimant appeared with his attorney.  R. 1723.  On January 4, 2007, ALJ Armstrong rendered a decision unfavorable to Claimant, finding that through December 31, 2001, Claimant had the severe impairment of post-traumatic stress disorder ("PTSD") and the residual functional capacity ("RFC") for light work.  R. 70-71.  The ALJ concluded that Claimant was unable to perform any of his past relevant work, but was not disabled because there were other jobs existing in significant number in the national economy that he could perform.  R. 70, 75-76.

On May 22, 2008, following Claimant's timely request for review, the Appeals Council vacated the hearing decision and remanded Claimant's case for further consideration of Claimant's ability to work a full-time job.  R. 55, 63-64.  Specifically, the Appeals Council noted that while the ALJ accorded significant weight to statements by Claimant's treating

physician, Dr. Thomopoulos, indicating that Claimant was only able to work "part-time within a 30-minute driving radius," such statements were not reflected in the ALJ's RFC finding.  R. 55.

Upon remand, ALJ Armstrong presided over another hearing on June 8, 2009 during which Claimant was represented by an attorney.  R. 1620.  Claimant and Thomas Grzesik, a vocational expert, testified in person; Dr. Robert Coyle, a medical expert, testified by telephone. R. 1620-1720. On August 10, 2009, ALJ Armstrong rendered a decision finding Claimant not disabled because he could perform a significant number of jobs in the national economy through his date last insured.  R. 24-43. The Appeals Council denied Claimant's timely request for review and the ALJ's August 2009 decision became the final order of the Commissioner.  R. 7-10, 22-23.  Claimant subsequently filed this action for review pursuant to 42 U.S.C § 405(g).  The parties have consented to this Court's jurisdiction pursuant to 28 U.S.C. § 636(c). Dkt. 9.  The Court held an oral argument on June 13, 2012.

## B.    Hearing Testimony

The record contains transcripts of two administrative hearings, both of which were presided over by ALJ Armstrong.  The September 14, 2006 hearing was the basis for the initial denial; the June 8, 2009 hearing was held after the Appeals Council vacated the first decision by the ALJ.

### 1.    Gregory Allen, Sr. - Claimant - September 14, 2006 and June 8, 2009

Claimant testified at both hearings.  At the time of the second hearing, Claimant was forty-four years old and divorced with three children. R. 114, 1630.  Claimant attended

college for two years. R. 145. Claimant served in the U.S. Navy from April 1984 through April 1988 as a ship's serviceman. R. 140. Beginning in January 1989, Claimant worked as a clerk supervisor for the U.S. Postal Service. *Id.* While working at the Postal Service in August 1995, Claimant witnessed a workplace shooting by a postal employee. Claimant testified that the gunman aimed the gun at him and pulled the trigger, but the gun failed to go off. R. 1672.

Shortly after the shooting incident, Claimant received counseling at the Postal Service. R. 1729. Claimant attempted to return to work at the post office, but he quickly began experiencing nightmares, a loss of appetite, and trouble interacting with his then-wife and children. *Id.* Between late 1996 and 2003, Claimant attempted to return to school part-time and for a few months he worked part-time as a sales associate at Marshall Fields. R. 1645-46; 1730-31. Claimant quit both of those endeavors because he reportedly struggled to sleep at night and had concentration difficulties. R. 1645. Claimant has not worked part or full-time since late 1996. R. 1633.

Currently, Claimant supports himself with disability benefits from the military and the postal service. R. 1652, 1688. Claimant continues to experience PTSD symptoms such as insomnia, headaches, flashbacks, and difficulties concentrating. R. 1626. In particular, Claimant testified that he rarely sleeps through the night and very often experiences nightmares and flashbacks of the shooting. R. 1636. Claimant complains of sporadic daytime flashbacks, intense headaches, and falling asleep during the day. R. 1636-38. Claimant believes many of his daytime symptoms are the result of, or exacerbated by, his

lack of sleep.  R. 1635-36.  He also testified that he struggles to focus on routine tasks and is forgetful.  R. 1647.  Fear is his biggest impediment to performing work on a full-time basis.  R. 1648.  He has severe headaches that sometimes keep him in bed for three to four days.  R. 1649.

Claimant exercises somewhat regularly.  R. 1631-32.  He has partial custody of his younger son and daughter and has assisted with coaching their baseball and softball teams. R. 1632, 1651.  Comparing coaching and work, Claimant testified that he is not scared of coaching the way he is of work; it is "safer" and "more pleasant," and he doesn't "have to worry about [someone] shooting at [him]."  R. 1651. Claimant testified that while he can recognize that his flashbacks are not real, when flashbacks do occur he still has to sit down and take a break from his current activity; those breaks often lasts several hours.  R. 1639-40. Claimant testified he does not feel he is able to work full-time due to lack of focus, flashbacks and difficulty sleeping.  R. 1633.

### 2.    Dr. Robert Coyle – Medical Expert ("ME") - June 8, 2009

Dr. Robert Coyle, a clinical psychologist, testified as a medical expert.  R. 1653-1708. The ME testified that Claimant demonstrated mild limitations regarding daily activities and social functioning, and "at least a moderate difficulty" with keeping pace and a need for unreasonable rest.  R. 1659-60.  The ME eventually determined that Claimant has marked limitations in concentration, persistence, and pace.  R. 1676.

The ME also testified that Claimant has experienced "repeated episodes of decompensation, each of extended duration," and engaged in a lengthy debate with the ALJ

regarding the definition of decompensation. R. 1664-82. The ME identified the period immediately after the shooting incident and Claimant's failed attempts to return to work as specific incidents of decompensation. R. 1682-83. The ME testified that even if Claimant did not meet Listing 12.06, he would certainly equal it. R. 1707.

The ALJ then asked the ME to assume Claimant did not meet a listing and asked what RFC the ME would assign. R. 1683-90. The ME declined to even discuss an appropriate RFC because he does not believe that Claimant can work full-time at all. R. 1686, 1690. The ME testified that there is "no question" that Dr. Thomopoulos's care was in line with medical standards, and her opinions would be "well-grounded and would have support from her records." R. 1694.

### 3. Mr. Thomas Grzesik – Vocational Expert ("VE") - June 8, 2009

Dr. Thomas Grzesik testified as a vocational expert. The VE classified Claimant's past work at the post office as "[l]ight per DOT, heavy per claimant, SVP 6, semi-skilled." R. 1709. The VE agreed that "a hypothetical individual with no exertional limitations, limits at the simple, unskilled work and no more than superficial contact with supervisors, co-employees . . . and no general public work" would not be able to return to any of Claimant's past relevant work. *Id.* However, the VE testified there is other work in the regional or national economy the hypothetical person could perform. R. 1709-10. Examples include "hand-packager," of which there are approximately 7000 jobs, "feeder/off-bearer," of which there are approximately 6000 jobs, and "industrial cleaner," of which there are 14,000 jobs. R. 1710.

The ALJ then posed a hypothetical further limiting the above individual to light exertional work, not able to lift more than ten pounds, and who cannot have exposure to noxious fumes, odors, respiratory irritants, or extreme temperature or humidity.  R. 1711. Again, significant jobs existed in the economy that the hypothetical person could perform. *Id.*

The VE testified that the hypothetical individuals above would not be able to perform available jobs if any of the additional limitations were added: intermittent flashbacks that made the person unable to work for an hour twice each week; missing two days of work each month; or intermittent difficulties with concentration that would prevent him from staying on task in a simple job for an average of fifteen minutes each hour.  R. 1714-15.  Regular problems with attendance or an inability to meet competitive standards would also eliminate available jobs.  R. 1715-17.  To be able to perform available jobs, the acceptable absentee rate would be from one half day to one full day per month.  R. 1718.

**B.    Medical Evidence**

**1.    Dr. Elaine Thomopoulos, Ph.D. – Treating Clinical Psychologist**

The record contains over 1200 pages of treatment records and medical opinions from Claimant's treating psychologist, Dr. Elaine Thomopoulos, including hand-written treatment notes, medical reports, and letters which span a ten year period.  Dr. Thomopoulous saw Claimant on a weekly basis from October 1995 through February 2005.  R. 1398, 1444-45.

**a.    Treatment Notes – October 1995 to February 2005**

Claimant began seeing Dr. Thomopoulos in October 1995, approximately two months after the shooting incident.  R. 289.  In general, the treatment notes include significant detail concerning Claimant's PTSD symptoms, issues with his personal and work life, and Dr. Thomopoulos's mental impressions of Claimant's condition.

Notes from Claimant's initial visits in 1995 detail that he was the supervisor of the shooter and was friends with the two men who were shot.  R. 289.  In his initial visit, he complained of nightmares (being chased by sharks, for example), trouble sleeping and falling asleep, and difficulty returning to work.  R. 289-95.  Dr. Thomopoulos indicated that Claimant was suffering from PTSD[1]  and had headaches in the past but the intensity was worse following the shooting.  R. 291.

Throughout 1996 and 1997 Claimant continued to experience PTSD symptoms and difficulties with his personal and work life.  R. 318-460.  Claimant noted he was getting only

---

[1] The Mayo Clinic defines PTSD as "a mental health condition that is triggered by a terrifying event" and can include symptoms such as flashbacks, nightmares, severe anxiety, and uncontrollable thoughts about the event. Definition of *Post-Traumatic Stress Disorder*, Mayo Clinic Online Health Information, http://www.mayoclinic.com/health/post-traumatic-stress-disorder/DS00246 (last visited Apr. 11, 2012).

a few hours of sleep each night and continued to experience vivid nightmares and painful headaches. R. 323-54. Claimant was on medication to assist with his sleeping difficulties. *See* R. 328, 335. Claimant expressed his interest in returning to school. R. 374-84. Claimant also expressed his belief that the Post Office discriminated against him and he appeared to be pursuing legal recourse. R. 389-403. Claimant reported that he was being followed by postal service employees. R 404-16. Further, Claimant noted continued difficulties with his wife and frustration with school. R. 404-45.

Claimant continued to struggle with school and his personal life in 1998. R. 461–583. Claimant had bizarre and vivid dreams, and continued to report that he was being followed. R. 480-92. However, in October 1998, Dr. Thomopoulos discussed Claimant's possible return to part-time work with some restrictions and Claimant indicated a willingness to try though it is unclear whether he ever returned to work. R. 554-59.

Notes from 1999 through 2001 reveal that Claimant filed for divorce from his wife and continued to struggle with PTSD symptoms. R. 583–684. Claimant reported difficulty concentrating at school and would often have nightmares and headaches after working on school assignments. R. 678. Claimant contemplated opening up a small business, such as setting up a laundromat and real estate business, but did not report taking any affirmative steps toward these goals. R. 668.

The treatment notes between 2001 and 2005 discuss Claimant's continued struggles with PTSD symptoms and problems with his family. R. 723–1358. Claimant reported that his flashbacks became more frequent than his nightmares, R. 1261, and he became upset after

witnessing a physical altercation at his son's little league baseball game. R. 1263-72.

Finally, in February 2005, Claimant stopped receiving worker's compensation benefits and

indicated he would no longer receive weekly treatment from Dr. Thomopoulos. R. 1398.

### b. Letters Regarding Claimant's Condition – September 1996 to July 29, 2002

Dr. Thomopoulos wrote a series of letters concerning Claimant's condition between

September 1996 and July 2002, some of which were addressed to Health Alliance, a health

insurance company, and some to the Office of Workers' Compensation Programs. R. 1432-

43. In both September and October 1996, Dr. Thomopoulos expressed that Claimant should

not drive more than 30 minutes, if at all, because of concerns of drowsiness and falling asleep

at the wheel. R. 1432-33.

In an August 1997 letter, Dr. Thomopoulos reported Claimant's condition showed

"some progress" but that he continued to experience headaches, insomnia, and nightmares,

although less severe than he reported during initial visits. R. 1435. In June 1998, Dr.

Thomopoulos recommended Claimant "participate in an intensive chemical dependency

program rather than attending college" that summer, believing that it would be too stressful

for him to both attend school and the treatment program. R. 1437.

By December 1998, however, Dr. Thomopoulos recommended that he "return to work

part-time in a controlled setting, or school part-time, but with not more than two courses each

term." R. 1439. She reiterated her concern about Claimant driving because of his tendency

to fall asleep at the wheel. *Id.* Dr. Thomopoulos expressed that she had no opinion on when

Claimant would be able to return to full-time work, but was hopeful that he would be able to return to part-time work during 1999. R. 1440.

In July 2002, Dr. Thomopoulos again recommended that Claimant should try a part-time job if he wished to return to work. R. 1443. Dr. Thomopoulos stated that Claimant should not work at the postal service, should not work with machinery due to his insomnia, and should not work with bright lights or loud noises due to his headaches and psychological condition. *Id.*

### c. November 2, 2001 Report

On November 2, 2001, at the behest of the State Disability Determination Services ("DDS"), Dr. Thomopoulos completed a report regarding Claimant's condition. R. 200-04. Dr. Thomopoulos reported that Claimant experienced insomnia, flashbacks, nightmares, headaches, a lack of concentration, organization and forgetfulness, depression, fearfulness, and some stomachaches. R. 200-01. Dr. Thomopoulos reported that Claimant was able to care for himself, that he cared for his children on the weekends, and he used public transportation to travel. R. 201. She opined that Claimant could not perform full-time work-related activities, nor would he be able to respond appropriately to customary work pressures. R. 203.

Dr. Thomopoulos opined in May 2001 that while Claimant showed some improvement, he was not ready to return to work full-time and could not return to a postal facility, as that may worsen his condition. R. 205. Dr. Thomopoulos thought school was a better option for Claimant, but that if Claimant were to be employed she recommended that it be on a part-time basis and not for more than four hours per day at first. R. 207.

11

### d. June 14, 2004 Report

On June 12, 2004, Dr. Thomopoulos reported that Claimant's symptoms include insomnia, headaches, lack of concentration and organization, depression, nightmares, flashbacks, and fearfulness. R. 1444-45. She observed that Claimant often appeared tired and was usually sad and fearful. *Id.* Dr. Thomopoulos noted Claimant was able to care for himself and his children, as well as complete household chores and exercise regularly. R. 1444. She opined that Claimant was not able to work at the post office or in any other job. R. 1446.

### e. Mental Residual Functional Capacity Questionnaire – April 8, 2005

On April 8, 2005, Dr. Thomopoulos completed a Mental Residual Functional Capacity Questionnaire. R. 235-39. She reiterated his PTSD diagnosis and indicated his prognosis was "guarded." R. 235. Due to Claimant's symptoms she believed he would not be able to maintain regular attendance or complete a normal workweek. R. 237. She noted Claimant was unable to work due to stress and would require an unreasonable number of lengthy rest periods. *Id.* Claimant had difficulty remembering and carrying out detailed instructions and he would be unable to perform semi-skilled or skilled work due to stress. R. 237-38. She described Claimant as being vigilant and distrustful of other people. R. 238.

### 2. Jesse Brown Veterans Affairs ("VA") Medical Center

The medical record contains treatment notes from the Jesse Brown VA Medical Center. R. 1465-1611. Claimant presented there on March 15, 1996 and treatment notes continue through March 2004. *Id.* The notes, similar to those of Dr. Thomopoulos, describe

Claimant as suffering from PTSD symptoms such as lack of sleep, nightmares, headaches, depression, and flashbacks, R. 1466-69, and that Claimant believed postal service investigators were following him. R. 1587. The notes also reveal that Claimant was tardy to (or did not show up for) a number of sessions. R. 1478, 1586-88, 1603.

### 3. Dr. Darryl Troupe, M.D.

The medical record contains several discussions of Claimant's medical condition by Dr. Darryl Troupe, M.D., a staff psychiatrist from Diversified Behavioral Services Inc. R. 1402-20. Dr. Troupe noted in a letter dated November 30, 2005, that Claimant's condition is "consistent with [PTSD]" and "to this day he continually endures the symptoms of PTSD" as a result of the post office shooting. R. 1411. Dr. Troupe wrote that the stress of being under surveillance caused Claimant to be "chronically frightened, mistrustful and hypervigilant." *Id.*

In a separate letter dated March 20, 2006, Dr. Troupe stated Claimant suffers from psychological scars. R. 1414. In conclusion, Dr. Troupe stated Claimant has a "chronic condition that requires periodic visits to the psychiatrist for direct care" and that "his condition . . . is expected [to continue] for an extended period, including exacerbations. Without recovery he may not work." R. 1414.

Dr. Troupe also completed a Mental Impairment Questionnaire regarding Claimant dated August 8, 2006. Dr. Troupe noted Claimant had a global assessment of functioning

(GAF) score of 69,[2] had mild or moderate functional limitations, and had very good mental abilities and aptitudes needed to do unskilled work. R. 1402-06. Dr. Troupe further noted that Claimant, in his view, was not a malingerer and anticipated Claimant's impairment or treatment would cause him to miss "about four days [of work] per month." R. 1407.

### 4. Dr. Amin N. Daghestanu, M.D.

On May 6, 2001, Dr. Amin N. Daghestanu, M.D., a psychiatrist and independent medical examiner with Oak Brook Behavioral Health, submitted an opinion regarding Claimant's worker's compensation claim. R. 209-11. Dr. Daghestanu concluded Claimant "continues to exhibit symptoms of PTSD" and "is unable to work at all postal facilities" because such facilities "serve as triggers for his PTSD symptoms." R. 209-10. Dr. Daghestanu opined that Claimant "should be attempting to work in a non-postal office related type of work." R. 210. However, Dr. Daghestanu qualified this assessment by noting, "[t]his attempt should begin with the approval of his treating psychiatrist and treating therapist initially on a part-time basis, and it is then to be progressed on to a full-time basis if possible." *Id.*

### 5. Tracy L. Benford, Department of Veterans Affairs

Dr. Tracy L. Benford, a staff psychiatrist with the Department of Veterans Affairs, discussed Claimant's condition in a letter dated August 1, 2002. R. 227. Dr. Benson noted Claimant suffers "from multiple symptoms of [PTSD], including insomnia, nightmares,

---

[2] A GAF score is utilized by a clinician to gauge in individual's overall level of functioning and his/her ability to carry out activities of daily living. The GAF score is measured on a 100-point scale indicating overall level of psychological, social, and occupational functioning on a hypothetical continuum. Gaf Score, *www.gafscore.com* (last visited Apr. 11, 2012).

difficulty concentrating, flashbacks of the incident, and isolation from others." R. 227. Dr. Benson further noted Claimant "does not feel that he could ever work for the postal service again because he does not feel safe in that environment," and that "he will be unable to commute to any job because he has had four accidents between 1998 and 1999 due to falling asleep at the wheel." R. 227.

### 6. Medical Consultants – Disability Determination Services

State DDS medical consultants also reviewed Claimant's medical record. In November 2001 Dr. Tyrone Holleraur, Psy.D., completed a Psychiatric Review and concluded: Claimant's functional limitations in activities of daily living vary between mild and moderate functional limitations; he has between mild and no limitations in maintaining social functioning; and his limitations in maintaining concentration, persistence, and pace vary between mild and moderate. R. 222. Dr. Hallerauer further noted Claimant has no limitation regarding "episodes of decompensation, each of extended duration." *Id.*

In June 2005, Dr. Kirk Boyenga concluded that Claimant has: mild limitations in activities of daily living; moderate limitations in maintaining social functioning; and mild limitations in maintaining concentration, persistence, and pace. R. 277. Dr. Boyenga noted that the record does not reflect any episodes of decompensation of extended duration. *Id.*

### D. The ALJ's Decision – August 10, 2009

Following the June 8, 2009, hearing and review of the medical evidence, the ALJ rendered a decision unfavorable to Claimant. R. 24-43. The ALJ found that Claimant was not disabled as of December 31, 2001, his date last insured. R. 28.

15

The ALJ evaluated Claimant's application under the required five-step analysis. R. 28-29. At step one, the ALJ found that Claimant did not engage in substantial gainful activity during the period from his alleged onset date of June 20, 1996, through his date last insured. R. 29. At step two, the ALJ determined that Claimant had the severe impairments of PTSD and headaches. *Id.*

At step three, the ALJ found Claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. R. 30. Specifically, the ALJ determined Claimant's mental impairment did not meet or medically equal the criteria of listings 12.04 (*Affective Disorders*), 12.06 (*Anxiety-Related Disorders*), and 12.08 (*Personality Disorders*) because Claimant failed to satisfy the section "B" criteria for such impairments.

The ALJ then considered Claimant's residual functional capacity ("RFC"), *i.e.* "the most [a claimant] can still do despite [his] limitations." R. 31; 20 C.F.R. § 404.1545. The ALJ determined that through the date last insured Claimant had the RFC to perform a full range of work at all exertion levels but with the following "non-exertional" limitations: Claimant is only capable of performing simple, unskilled work with no public contact and no more than superficial contact with supervisors, co-employees, and the general public. R. 31.

After a lengthy review of the medical evidence of record, the ALJ assessed how much weight to afford each opinion. The ALJ gave only "limited weight" to the opinions of Claimant's treating psychologist, Dr. Thomopoulos, in assessing the RFC, but some weight

to her opinions in eliminating Claimant's past relevant work.  R. 36.  The ALJ gave considerable weight to Dr. Troupe's opinion that Claimant does not meet a listing, but not controlling weight to his opinion that Claimant was unable to work.  R. 37.  The ALJ gave Dr. Daghestanu's opinions significant weight; he also gave great weight to the opinions of the state agency medical consultants.  R. 37-38.

In assessing Claimant's credibility, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the RFC determination.  R. 32.  The ALJ gave "limited weight to the Claimant's testimony and allegations, since they [were not] corroborated by the record as a whole."  R. 40-41.

At step four, the ALJ found that through Claimant's date last insured he was unable to perform any past relevant work.  R. 41.  The ALJ reasoned that, although Claimant could physically perform the duties of his past work, the medical evidence of record indicated he should not return to work at a Post Office.  R. 42.

At step five, the ALJ determined that through Claimant's date last insured, there were jobs that existed in significant numbers in the national economy that Claimant could have performed.  *Id.*

## II. LEGAL STANDARDS

### A.    Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ

becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the decision of the ALJ. *Id.* The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Id.*; *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even when the record contains adequate evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or an adequate discussion of the issues, it must be remanded. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Further, an error of law warrants reversal "irrespective of the volume of evidence supporting the factual findings." *Scmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

**B.     Disability Standard**

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined by the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A). An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i-v). The ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable if performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ must determine whether other jobs exist in the national economy that the claimant can perform. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008).

### III. DISCUSSION

Claimant raises the following issues in support of his motion: (1) whether the ALJ erred in finding that Claimant does not meet or equal Listing 12.06; (2) whether the ALJ's determination that Claimant can perform full-time work was supported by substantial evidence; and (3) whether the ALJ properly evaluated Claimant's credibility under SSR 96-7p. This was an unusually lengthy medical record: the medical evidence alone is just over 1400 pages. Preliminarily, despite the Court's finding that the ultimate decision was not

supported by substantial evidence, it is worth noting that the ALJ was conscientious in his review of the medical evidence and clearly endeavored to provide a comprehensive overview of the record.

**A.    The ALJ Did Not Commit Legal Error in Determining that Claimant Does Not Meet or Medically Equal a Listed Impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.**

Claimant argues that the ALJ erred in reaching his conclusion that Claimant does not meet or medically equal Listing 12.06, *Anxiety-related disorders*. In order to meet Listing 12.06, a claimant must satisfy criteria in both Sections A and B or in both Sections A and C. Listing 12.06, 20 C.F.R. Part 404, Subpart P, App. 1. The parties do not dispute whether Claimant satisfies Section A. The disagreement is over whether Claimant satisfies Section B, which requires at least two of the following: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." *Id.*

Regarding Section B, the ALJ concluded: Claimant has mild restrictions in activities of daily living; he has mild limitations in maintaining social functioning; he has moderate difficulties maintaining concentration, persistence, and pace; and the record reflects, at most, one episode of decompensation. R. 30. At the hearing, the ME opined that Claimant meets Listing 12.06 because he has marked restrictions in maintaining concentration, persistence, or pace and he has experienced repeated episodes of decompensation. Claimant argues that, while the ALJ was not bound by the ME's testimony, the ALJ committed legal error by

20

rejecting that opinion based on the ALJ's own opinions and misapprehension of the evidence. The Court disagrees.

### 1. Substantial evidence supports the ALJ's determination that Claimant has moderate, rather than marked, limitations in concentration, persistence, and pace.

The ALJ asked the ME for his opinion on Claimant's limitations in concentration, persistence and pace. The ME was concerned about Claimant's limitations in this area based on Dr. Boyenga's Psychiatric Review and Mental RFC. R. 1659. Those reports indicate moderate difficulty with keeping pace and a need for unreasonable rest, among other things. R. 277, 281-82. Later in the hearing, however, the ME opined that Claimant has marked limitations in concentration, persistence, and pace. R. 1676. The ME cited mistakes Claimant made in a serial seven exercise to support his conclusion. R. 1677-78. The ALJ, after debating the evidence with the ME, confirmed: "you say he's markedly limited, and you point to this moderately limited as evidence that he's markedly limited?" to which the ME replied in the affirmative. R. 1681.

An ALJ may not discredit a doctor's opinion based on his own beliefs or misapprehensions. *See Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) ("Whether by mistake or by design, the ALJ disregarded this medical evidence and improperly substituted his own opinion."); *Murphy v. Astrue*, 496 F.3d 630, 634 (N.D. Ill. 2007) ("And we have explained that an ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). However, the ALJ in the case at bar based his conclusion of moderate limitation on other medical evidence that indicates a moderate

limitation in concentration, persistence, and pace. Dr. Troupe, a treating source, indicated moderate limitations in concentration, persistence and pace. R. 1405. In 2001, state reviewing doctor Dr. Halleraur indicated between mild and moderate limitations in concentration, persistence, and pace. R. 222. In 2005 another state reviewing doctor, Dr. Boyenga, found mild limitations in this area. R. 227. Contrary to Claimant's arguments, the ALJ's determination is unlike those cases where the ALJ mischaracterizes another doctor's opinion, *Larson*, 615 F.3d at 749, or simply disregards the doctor's opinion in favor of his own, *Murphy*, 496 F.3d 630 (citing *Barnett v. Astrue*, 381 F.3d 644, 669 (7th Cir. 2004)). Here, the ALJ questioned the ME's opinion, considered significant other medical evidence in the record and reasonably concluded that Claimant has moderate, rather than marked, limitations in concentration, persistence, and pace.

> **2.** **Substantial evidence supports the ALJ's determination that Claimant has experienced, at most, one episode of decompensation.**

Claimant also argues the ALJ erred by improperly rejected the ME's testimony that Claimant experienced multiple episodes of decompensation. The ALJ and the ME debated the meaning of "episodes of decompensation" at length and it was noted that the precise definition of this phrase has caused confusion in the social security area for decades. R. 1700-01. The regulations provide:

> *Episodes of decompensation* are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less

stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. If you have experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, we must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence.

20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(4).

In *Larson*, the Seventh Circuit addressed some of the confusion around identifying episodes of decompensation.

Although everyone seemed to think that he or she knew what is meant by "episodes of decompensation," this is not a self-defining phrase.... An incident–such as hospitalization or placement in a halfway house –that signals the need for a more structured psychological support system would qualify as an episode of decompensation, but so would many other scenarios. The listing recognizes than an episode may be inferred from medical records showing a significant alteration in medication.

*Larson*, 615 F.3d at 750 (internal citations omitted).

The *Larson* court found that a significant alteration in the claimant's medications indicated an episode of decompensation. *Id.* In contrast to even the expansive definition offered in *Larson,* the ME's opinion that Claimant has experienced sufficient episodes of decompensation to meet the listing was based on "the entire file." R. 1682. At one point, the ME testified that one episode of decompensation was immediately following the shooting

23

incident and others were when Claimant unsuccessfully attempted to return to work. R. 1666-68. However, the ME also explained that Claimant was experiencing "a continuous decompensation." R. 1676. The ALJ noted that Claimant's treatment has remained the same since the original trauma, and the ME agreed. R. 1668.

The ALJ's determination that Claimant did not experience three episodes of decompensation of significant duration is supported by substantial evidence. The ALJ explained that he gave little weight to the ME's testimony on this issue because the doctor could not support his opinions with references to the record. R. 39. The ME took a very broad view of "episodes of decompensation," one that is more broad than the *Larson* court discussed. Both *Larson* and the Social Security regulations indicate that episodes of decompensation have some marker or evidence that makes them discrete events. Here, the ALJ did not insist on an episode as severe as hospitalization, but did not find that a continuous decompensation, spanning the entire record, met the definition.

Additionally, other medical evidence supports the ALJ's determination that Claimant has not experienced episodes of decompensation within the meaning of the listing. Dr. Thomopoulos's treatment notes and her reports do not reflect significant changes in treatment or medication. R. 289-1398. Dr. Holleraur, Dr. Boyenga, and Dr. Troupe, did not find that Claimant experienced any episodes of decompensation. R. 222, 277, 1405. Dr. Halleraur did not find that Claimant experienced any episodes of decompensation. R. 222. Dr. Boyenga did not find that Claimant experienced any episodes of decompensation. R. 277. Thus, the ALJ's conclusion that Claimant has not experienced episodes of decompensation

with the meaning of the listing is supported by substantial evidence.

**3.** **The ALJ did not err in finding that Claimant's impairments do not medically equal listing severity.**

The ALJ is responsible for deciding the question of whether a listing is met or equaled. SSR 96-6p, 1996 SSR LEXIS 3, * 7-8. The Seventh Circuit has explained that "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 644, 670 (7th Cir. 2004). As the Commissioner points out, SSR 96-6p states that the signature of a state agency medical or psychological consultant on a Disability Determination and Transmittal Form ensures that a psychologist has considered the question of medical equivalence. SSR 96-6p at * 8.

Regarding medical equivalence to Listing 12.06, the regulations indicate that where a claimant has experienced "more frequent episodes of [decompensation of] shorter duration or less frequent episodes of longer duration, [the ALJ] must use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding in a determination of equivalence." 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00(C)(4); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) (noting that the opinion of a medical expert on equivalence should be considered and given appropriate weight).

Here, the ALJ stated that "no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment." R. 31. The ALJ pushed the ME to identify episodes of decompensation, of any duration and found that the ME was unable to support his opinion with any reference to the record. R. 30-31.

When evaluating Claimant's credibility, the ALJ evaluated whether the testimony

indicates that Claimant's limitations rise to the level of listing severity and again reiterated his opinion that Claimant's limitations do not equal Listing 12.06. R. 40-41. Dr. Frank Jimenez signed a Disability Determination Transmittal form dated November 15, 2001 indicating that he approved the denial, which ensures that medical equivalence was considered. R. 94; SSR 96-6p at *8. While the ALJ did not specifically refer to this form, the ALJ did go to great lengths to explain why he discounted the ME's testimony that Claimant's impairments equaled listing severity, based both on medical evidence of record and Claimant's own testimony. Substantial evidence supports the ALJ's conclusion.

**B.     The ALJ's RFC Determination that Claimant is Capable of Full-Time Work Is Not Supported By Substantial Evidence.**

The RFC is a claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his mental and physical limitations. SSR 96-8p, 1996 SSR LEXIS 5, *5; *see also Craft*, 539 F.3d at 676-77. A "regular and continuing basis" means eight hours per day for five days per week, or an equivalent work schedule. SSR 96-8p at * 5. The RFC is based upon the medical evidence in the record and other evidence, including the testimony of a claimant and others at the hearing. *Craft*, 539 F.3d at 677 (citing 20 C.F.R. § 404.1545(a)(3)). The ALJ must determine how much weight to afford the opinions of doctors and must explain those decisions. *Id.* (citing 20 C.F.R. § 1527(d), (f)). When determining an RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those not considered severe. *Id.* (citing 20 C.F.R. § 404.1545(a)(2), (b), (c)). Mental limitations are

included in the RFC because a limited ability to complete activities, such as responding appropriately to supervisors, may reduce a claimant's ability to perform past and other work. *Id.*

The ALJ found that Claimant has the RFC to "perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is only capable of performing simple, unskilled work with no public contact and no more than superficial contact with supervisors, co-employees, and the general public." R. 31. Claimant argues, and the Court agrees, that the ALJ's determination that Claimant is capable of working full-time is not supported by substantial evidence.

Courts in this circuit have acknowledged that treating physicians are typically in a better position to judge a claimant's limitations than non-treating doctors and their opinions are therefore generally entitled to more weight than those of a non-treating doctor. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *Smith v. Astrue*, 2012 U.S. Dist. LEXIS 14341, at *16 (N.D. Ill. Feb. 3, 2012). If a treating source is not given controlling weight, the ALJ is to consider: the length, nature and extent of the treatment relationship, supportability of the opinion; whether it is consistent with treatment notes, and the specialization of the doctor. 20 C.F.R. § 404.1527(c).

Dr. Thomopoulos's lengthy history of treating Claimant is reflected in her opinion letters and reports. In 1998, Dr. Thomopoulos opined that any work should be within a thirty minute drive from Claimant's home and that she was not certain he would be able to function at work; she was hopeful Claimant would be able to return to work part-time in 1999 but

could not say when he would be able to return to work full-time. R. 1439-40. Letters in 2001 and 2002 indicate her support for a part-time work attempt. R. 1441-43. In 2001, Dr. Thomopoulos did not believe that Claimant could do full-time work related activities due to his "persistent severe headaches, lack of sleep, depression, fearfulness, impaired ability to concentrate and difficulty in handing [sic] supervision." R. 203. In a separate letter in May 2001, Dr. Thomopoulos recommended that if Claimant were employed it should be in a part-time job of no more than four hours per day initially. R. 207. In 2004, Dr. Thomopoulos submitted a report supporting Claimant's claim for Federal Disability Retirement Benefits in which she opined that "because of persistent severe headaches, insomnia, depression and impaired ability to concentrate," she still did not feel that Claimant was able to work at any job; because his condition had been ongoing for nine years, she also did not think he would be able to work anytime in the near future. R. 1446. In 2005, she opined that Claimant would not be able to deal with the stress of work and that Claimant's impairments or treatment would cause him to be absent from work more than four days per month. R. 237-39.

The ALJ gave limited weight to Dr. Thomopoulos's opinions when evaluating Claimant's RFC. R. 36. In doing so, the ALJ failed to discuss why problems with family members, symptoms of headaches, bad dreams and flashbacks waxing and waning are inconsistent with Dr. Thomopoulos's assessment. Further, her opinion was not inconsistent with other medical opinions, save the non-examining state agency doctors. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (holding that substantial evidence must support

a decision to reject an examining doctor's opinion; a contradictory opinion from a non-examining doctor is insufficient). While the ALJ included a detailed summary of Dr. Thomopoulos's treatment notes, he did not appropriately weigh her opinions as required by 20 C.F.R. § 404.1527(c).

At least three other doctors gave opinions consistent with Dr. Thomopoulos's conclusion that Claimant is not capable of full-time work. First, Dr. Troupe opined in 2006 that Claimant's impairments or treatment would require him to be absent from work about four days per month. R. 1407. The ALJ gave considerable weight to Dr. Troupe's opinions on whether Claimant met a listing and whether he could work in a post office, but did not give controlling weight to his opinion that Claimant could not work at all. R. 37. Second, the ALJ attempted to engage the ME in a conversation about potential RFC determinations and the ME refused to discuss an RFC because he did not find Claimant capable of full-time work. R. 1690. The ALJ gave the ME's opinions little weight. R. 39-40.

Third, Dr. Daghestani recommended in May 2001 that "Mr. Allen should be attempting to work in a non-postal office related type of work. This attempt should begin with the approval of his treating psychiatrist and treating therapist initially on a part-time basis, and it is then to be progressed on to a full-time basis if possible." R. 210. The ALJ gave significant weight to Dr. Daghestanu's opinion, which was dated seven months before Claimant's date last insured, but then found Claimant capable of performing full-time work. R. 37. Dr. Daghestanu's opinion that Claimant could work part-time was contingent on approval from his treating psychiatrist (Dr. Thomopoulos) and he could not say for sure that

full-time work was a possibility.  R. 210.

The only medical evidence in the record that Claimant can perform full-time work is from the non-examining state agency doctors.  Not surprisingly, the ALJ gave great weight to their opinions in determining that Claimant can work with the restrictions reflected in the RFC.  R. 38.

The ALJ clearly believes Claimant can work full-time.  However, substantial evidence simply does not support that finding.  *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own qualified opinion").  While substantial evidence may support a finding that Claimant is capable of part-time work, an ability to work part-time is not the same as full-time.  *Larson*, 625 F.3d at 752 (noting that the ability to work a few hours each week is significantly different from having the ability to work full-time).  The testimony of the VE at the hearing confirmed that missing work more than, at best, one day per month, would eliminate the jobs that Claimant could otherwise perform.   The ALJ did not build a logical bridge from the evidence to his conclusion that Claimant can work full-time and is therefore capable of performing the jobs identified by the VE at the hearing.

## C.    In Light of the Remand, the ALJ Should Properly Analyze Claimant's Credibility Based on SSR 96-7p.

When faced with a claimant alleging subjective pain symptoms, an ALJ must evaluate the credibility of a claimant's testimony about his pain.  SSR 96-7p.  The ALJ must consider testimony in light of the entire record and be "sufficiently specific" as to the reasons for his

credibility determination. *Id.* Since the ALJ is in the best position to observe a witness, however, his credibility finding will not be overturned as long as it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-89 (7th Cir. 2001). Credibility determinations of the ALJ are given particular weight and will be reversed only if the claimant can show it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). A lack of medical testimony in the record supporting a claimant's subjective complaints of pain may be probative of a claimant's credibility. *Id.* However, an ALJ may not discount a Claimant's credibility solely on the basis of objective medical evidence. *See, e.g.*, *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (holding it was error for the ALJ to reject a claimant's testimony because there was no clinical support for the alleged limitation).

The ALJ in the case at bar appropriately referred to SSR 96-7p, though simply listed it in the introduction to the RFC finding. R. 31. Early in the RFC analysis, the ALJ included the template language recently been criticized by the Seventh Circuit. R. 32; *Bjornson v. Astrue*, No. 11-2422, 2012 U.S. App. LEXIS 1790, at *15 (7th Cir. 2012). After evaluating the medical evidence of record, the ALJ turned to his assessment of Claimant's credibility. The ALJ concluded that while Claimant's testimony and activities of daily living give some support to his allegations, "it is not sufficient to overcome the generally unremarkable medical findings and other factors" and found that Claimant's testimony and allegations were not corroborated by the record as a whole. R. 40-41. The ALJ identified at least two points of inconsistency regarding Claimant's asserted limitations: the notes reflect various reasons,

other than difficulties with concentration, that Claimant quit school; and Claimant's assertion that he cannot drive is belied by his report that he has been late to pick his daughter up from school. R. 40-41.[3]

While the ALJ's review of the medical evidence reflects some of the optimistic statements made by Claimant and his therapist, the ALJ did not directly rely on those statements in evaluating Claimant's credibility. Claimant is correct that such optimistic statements would not indicate an ability to hold down a full-time job. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008) (noting that, in the context of bi-polar disorder, having the ability to work half the time is not enough to keep a full-time job).

Claimant appears to function appropriately in some instances but testified that he experiences flashbacks that interrupt his activity or nightmares that make him tired during the day. The ALJ spent a great deal of time discussing Claimant's GAF score and the fact that he was actually being followed by postal inspectors, but does not discuss Claimant's credibility regarding flashbacks, nightmares, and drowsiness—the very issues that support his allegations that he cannot work full-time. Claimant testified, without contradiction, that when he has a flashback he has to remove himself from a particular setting and that it takes a period of time to recover. R. 1639-40. *See Indoranto*, 374 F.3d at 474-75 ("The record is replete with evidence of the severe pain [claimant was experiencing]... She testified in detail about her pain severely limited her daily activities, and there is nothing incredible or

---

[3]The Court is not clear why this is a direct contradiction. It is possible that Claimant was late picking his daughter up from school via public transportation.

inconsistent about her statements that she lies down and takes baths during the day to alleviate her pain."). Claimant's testimony that he has flashbacks and nightmares that result in breaks and daytime fatigue was supported by the evidence, but the ALJ did not analyze the extent to which these incidents impact Claimant's ability to work.

Given the considerable deference that is afforded to an ALJ's credibility determination, the Court is not prepared to find that it was "patently wrong." However, in light of the remand, the ALJ should reevaluate Claimant's credibility as it relates to the impact his flashbacks, nightmares and fatigue have on the RFC determination.

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court grants Claimant's motion to reverse or remand the decision of the Commissioner; denies the Commissioner's motion to affirm the Commissioner's decision; and remands the case to the Social Security Administration for further proceedings consistent with this opinion.

SO ORDERED THIS 22nd DAY OF JUNE, 2012.

*Morton Denlow*

**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Marcie E. Goldbloom                          Ernest Y. Ling
Daley, DeBofsky & Bryant                     Assistant United States Attorney
55 West Monroe Street, Suite 2440            219 S. Dearborn Street
Chicago, IL 60603                            Chicago, IL 60604

**Counsel for Plaintiff**                    Cynthia A. Freburg
                                             Assistant Regional Counsel
                                             200 West Adams Street
                                             Suite 3000
                                             Chicago, IL 60606

                                             **Counsel for Defendant**